**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ANDREW R. PERRONG
1657 THE FAIRWAY #131
JENKINTOWN, PA 19046

       Plaintiff

v.

RAMY KHALIL
1808 DOVER RD.
SOUTHAMPTON, PA 18966,

AND

JIHAN GHANIM
32 CONSHOHOCKEN STATE RD APT F3
BALA CYNWYD, PA 19004

       Defendants.

Case No. 2:22-cv-01899

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

### Preliminary Statement

1.     Plaintiff Andrew R. Perrong ("Plaintiff"), brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2.     Plaintiff alleges that Ramy Khalil and his wife, Jihan Ghanim, commissioned a series of automated illegal telemarketing "robocalls" to originate new customers for their real estate consulting company by sending calls to telephone numbers listed on the National Do Not Call Registry and for which the called party is charged for the calls, like Mr. Perrong's number, which is prohibited by the TCPA. The calls were made either directly by Khalil, Ghanim, or their

1

agents for their fictitiously named unregistered DBA "We Buy Any Philly Home" and at the supervision, direction, and control of Khalil and Ghanim.

3.      The Plaintiff never consented to receive such calls, which were placed to him for telemarketing purposes.

## Parties

4.      Plaintiff Andrew R. Perrong is a Pennsylvania resident, and a resident of this District.

5.      Defendant Ramy Khalil is domiciled and resides at 1808 Dover Rd. Southampton, PA 18966, which lies within this District.

6.      Defendant Jihan Ghanim is domiciled and resides at 32 Conshohocken State Rd. Apt. F3 Bala Cynwyd, PA 19004, which lies within this District.

## Jurisdiction & Venue

7.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012).

8.      Venue is proper under 28 U.S.C. § 1391(b)(1) because the Defendants are residents of this District.

## The Telephone Consumer Protection Act

9.      In 1991, Congress enacted the TCPA to regulate the explosive growth of the automated calling industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The TCPA Prohibits all Automated Calls To Protected Numbers

10.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(A)(iii).

11.     Congress singled out these services for special protection either because Congress realized their special importance in terms of consumer privacy and therefore protected them (as in the case of cellular phones), or because the numbers are assigned to services, like Mr. Perrong's VoIP service, for which the called party is charged, thus shifting the cost of automated or prerecorded telephone calls onto consumers. *See Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2363, (2020) (Gorsuch, J. & Thomas, J., concurring in part and dissenting in part).

12.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live calls, and such calls can be costly and inconvenient.

13.     The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

14.     This cause of action applies to users of any one of the four protected services (pager, cellular, specialized mobile radio [i.e. radiotelephony locator beacons or dispatch

3

systems], or another radio common carrier service [i.e. ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged for the call. *See Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *6 (E.D. Pa. July 15, 2021).

15.     "Non-emergency prerecorded voice or autodialed calls to [the destinations enumerated in 47 U.S.C. § 227(b)(1)(A)] are permissible only with the prior express consent of the called party." This includes *any* non-consensual calls made for non-emergency purposes, regardless of *whether or not* they are informational, telemarketing, telephone solicitations, or similar such calls. *See* FCC Enforcement Advisory: *Tel. Consumer Prot. Act Robocall & Text Rules - Biennial Reminder for Pol. Campaigns About Robocall & Text Abuse*, 31 FCC Rcd. 1940, 1941 n.6 (2016) [hereinafter FCC Advisory].

16.     Importantly, this Court has already held that non-consensual, non-emergency calls placed using an ATDS or a prerecorded voice to the *same telephone number at issue in this case* violate 47 U.S.C. § 227(b)(1)(A), regardless of the purpose of the call. *Victory Phones*, 2021 WL 3007258, at *6 (rejecting claim that non-commercial survey calls were exempt and holding that "[T]he operative language of the TCPA is unambiguous. Section 227(b)(1)(A) prohibits placing artificial and pre-recorded voice calls to a variety of telephone numbers."). To hold otherwise would read the words "any person" and "any call" out of the statute. *See id.*

The National Do Not Call Registry

17.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

4

18.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

19.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers whose numbers are on the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

Liability Under The TCPA

20.     Defendants Khalil and Ghanim are the owners and operators of "We Buy Any Philly Home," a fictitious entity, and are therefore responsible for any conduct purportedly carried out only in such fictious form.

21.     Under the TCPA, an individual such as Khalil or Ghanim may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*.

47 U.S.C. § 217 (emphasis added).

22.     Khalil and Ghanim personally participated in the actions complained of by: (a) personally selecting the phone numbers that would be called; (b) working on and approving the scripting that would be used on the calls; (c) selecting the dialing equipment or supplier of the same used to make the calls; (d) personally paying for the calls; (e) in the case of Khalil, actually physically placing at least two of the calls himself; and (f) in the case of Ghanim, acting as the

real estate agent that provides services that can only be performed by a licensed Realtor, as Defendant Khalil is not a licensed Realtor.

**Factual Allegations**

23.     Defendants describe themselves as operating a "real estate consulting company" that provides "fast, honest and professional real estate services," including "property investment," "help[ing] people navigate the best options for selling their homes," and "offer[ing] comprehensive services as a buyer's agent." We Buy Any Philly Home, GOOGLE MY BUSINESS SOCIAL PROFILE (June 8, 2022, May 24, 2022, and July 28, 2022), https://posts.gle/9osmxC, https://posts.gle/o1SGzj, https://posts.gle/zX6MsA; *see also* We Buy Any Philly Home, GOOGLE MAPS, https://g.page/webuyanyphillyhome?share [https://archive.ph/wip/wBP9I].

24.      Defendants also state that their services include "a fast & fair cash offer backed by transparent market analysis," a "solution that works best for you," and "serv[ing] you with a real estate deal that will give you the best deal ever."  We Buy Any Philly Home, GOOGLE MY BUSINESS SOCIAL PROFILE (July 6, 2022 and June 24, 2022), https://posts.gle/Yc7RkE, https://posts.gle/PtS86x.

25.     Defendants use telemarketing to solicit customers for their real estate services, as they did with the Plaintiff.

26.     Defendants are not registered as telemarketers with the Attorney General of Pennsylvania.

27.     In fact, Defendants, who do business under the name "We Buy Any Philly Home," are not registered in any capacity to do business under that name.

28.     One of the strategies used by Defendants involves the use of automated calls.

6

29.     Defendants send out these call blasts *en masse* to telephone numbers throughout the area, hoping they reach someone interested in their real estate services.

The Calls to Mr. Perrong

30.     Plaintiff Perrong is a "person" as defined by 47 U.S.C. § 153(39).

31.     Plaintiff listed his residential telephone number (the "Number"), 215-947-XXXX, on the National Do Not Call Registry on May 23, 2005, and the number has been on the Registry continuously since that time.

32.     The Number is used as a residential line and for residential purposes.

33.     The Number is not associated with a business.

34.     Despite this, the Defendants placed at least four telemarketing calls to the Number on June 29, October 5, and October 6, 2021.

35.     The Number is assigned to a Voice over Internet Protocol (VoIP) telephone service, which allows for voice calls to be placed over a broadband Internet connection.

36.     That Number, which is assigned to a VoIP telephone service, is charged for each call it receives.

37.     The VoIP telephone service for the Number is Anveo.

38.     The service charges a ring charge of $0.005 for the provision of Caller ID Name lookup information for each call placed to the Number, even if the call is not answered.

39.     The service also charges a per-minute charge of $0.004 per minute for voice charges for each minute of talk time, including voicemail time, for each call placed to the Number.

40.     The Number is therefore "assigned to a . . . service for which the called party is charged for the call" and any calls placed to that number are subject to the restrictions

7

enumerated in 47 U.S.C. § 227(b)(1)(A)(iii), including the prohibition against calling such numbers for non-emergency purposes without consent using an ATDS.

41.     The restriction against using an ATDS to call a number for which the called party is charged applies to *any non-emergency, non-consensual call*, regardless of its purpose, regardless of whether or not they are telephone solicitations (as in survey or political calls), and regardless of whether the individual called in on any do-not-call registry. *See Victory Phones*, 2021 WL 3007258, at *6. This is clearly indicated by the fact that the TCPA prohibits "any person" from initiating "any call" using an ATDS. *See id.*

42.     On June 29, 2021 at 3:01 PM, the Plaintiff received a call from the Defendants with the caller ID 267-682-7814.

43.     The telephone service provider for this telephone number is Twilio.

44.     When Plaintiff answered the call, there was a brief delay, silence, and an audible "click" when the caller on the other side came onto the line.

45.     The caller on that call, "Natalie," began to pitch the Plaintiff on Defendants' real estate services. Notably, the caller attempted to conceal their identity by claiming that her "boss" was the fictitiously-named "David Beckatini."

46.     When Plaintiff asked the agent for "David Beckatini's" number on the call, the agent provided the telephone number 267-780-9049, which is a number used by Defendant Khalil and appears to be paid for by Defendant Ghanim.

47.     The Plaintiff was working when he received the call, advised the caller of the same, and stated that he would call back only if he was interested.

48.     Despite that, and the fact that he was on the National Do Not Call Registry, the Defendants made another telemarketing call to the Plaintiff.

49.     On June 29, 2021 at 8:10 PM, the Plaintiff received a call from the caller ID 267-780-9049, the same number the agent "Natalie" provided on the 3:01 PM call earlier the same day. The Plaintiff was not available, and the caller was sent to voicemail, but no message was left. The name on the caller ID read "RAMY KHALIL."

50.     A search of TransUnion's TLOxp database, however, uncovered that the 267-780-9049 number is registered to Defendant Ghanim. This usually indicates that the subscriber of record and payor for the number is Defendant Ghanim.

51.     Because the caller ID read "RAMY KHALIL" and Plaintiff spoke to Defendant Khalil on multiple occasions on this number, including by calling it back, as discussed *infra*, it is likely that Defendant Khalil placed this call. Alternatively, because the number appears to be registered to and paid for by Defendant Ghanim, it is possible that Defendant Ghanim placed this call.

52.     On October 5, 2021 at 11:50 AM, the Plaintiff received yet another call from Defendants, this time from the caller ID 267-627-6350.

53.     The telephone service provider for this telephone number is Twilio.

54.      When Plaintiff answered the call, there was a brief delay, silence, and an audible "click" when the caller on the other side came onto the line. Moreover, the call began with choppy audio, which is usually the result of an overloaded internet connection in an automated call center.

55.     This time, the caller on the call, "Melanie," who stated that she was looking for an individual named "Harold," again tried to pitch the Plaintiff on Defendants' real estate services. Again, the caller claimed that her "boss" was a "private real estate investor in Philly" named "David," and that "David" would call the Plaintiff.

56. The Plaintiff instructed "Melanie" not to call him again and that any communication should be over email.

57. Despite this clear instruction not to be called, as well as the previous lack of interest, on October 6, 2021 at 11:07 AM, the Plaintiff received a call from the caller ID 267-780-9049.

58. This time, Defendant Khalil left a message seeking to solicit an individual named "Harold" to utilize Defendant's services for a property on Whitaker Avenue. Khalil stated that the Plaintiff received a call the previous day from "Melanie."

59. The message stated, "Hi, this message is for Harold. Harold, my name is Ramy. I believe you spoke with my assistant Melanie last night about your property on Whitaker Avenue. When you get a chance, could you give me a call back? I'm the investor. I'm interested in buying the property. My number here is area code 267-780-9049. Again, that's Ramy at 267-780-9049. I look forward to hearing from you soon. Thanks Harold."

60. In an effort to resolve this litigation prior to the filing of a lawsuit, Plaintiff called the number 267-780-9049 on October 6, 2021. The call went to voicemail, but Plaintiff received a call back from Defendant Khalil at approximately 1:15 PM. During the call, Defendant Khalil admits that he "missed a call from [the Plaintiff.]"  When Plaintiff stated that the Defendant made illegal calls, the Defendant stated that he was "sorry" and "we won't call you again."

61. In saying "we won't call you again," Defendant appears to have been referencing himself and Defendant Ghanm.

62. Thereafter, Defendant Khalil called the Plaintiff again. Defendant Khalil stated that he "check[ed] with [his] assistant, Natalie," who Defendant states "sent [him] a screenshot" and did not call Plaintiff on October 5. Although "Natalie" was the person Plaintiff spoke with on the

June 29 call, Plaintiff explained that the latest call came from an individual named "Melanie," and Plaintiff played Defendant a copy of the voicemail Defendant Khalil left.

63.     Defendant Khalil stated that he was "super confused" about the entire situation but nevertheless admitted that "somebody spoke to you." Defendant then laughed at Plaintiff's suggestion that the calls were illegal and told the Plaintiff, "Sue me today. Good luck."

64.     Defendant Khalil was likely "super confused" because he and Defendant Ghanim hired an automated calling center to contact individuals *en masse* and then provide the list of purportedly interested individuals to Defendants Khalil and Ghanim to close the called party on their real estate services. In fact, during the call, Defendant Khalil admitted that he receives approximately ten leads a day from his "assistant Natalie."

65.     Such call centers, such as the one Defendants appear to have hired, generally use fictitious, western-sounding names and expressions (such as "Philly") to portray a more professional and friendly appearance, especially when such call centers are not located locally.

66.     Furthermore, Defendant Khalil explained that he owned "two properties on Whitaker Street," and intended to direct Melanie to call other persons, including the Plaintiff, to solicit them for Defendants' real estate services.

Defendants' Use of an ATDS

67.     The calls were conducted using an Automatic Telephone Dialing System (ATDS). As the Supreme Court recently clarified, the key feature of an ATDS is the capacity to store numbers to be called using a random or sequential number generator or to produce numbers to be called using a random or sequential number generator. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

11

68.     The Third Circuit recently clarified that "Congress envisioned a broad understanding of 'equipment'" that constitutes an ATDS. It also clarified that the analysis of whether an ATDS was used in violation of the TCPA centers around "whether the defendant employ[s] [ATDS] capacities to make automated calls," *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 873, 878 (3d Cir. 2022). In so doing, it held that Congress intended to "ban all autodialed calls" because Congress "found autodialer technology to be uniquely harmful." *Id.* at 879 (cleaned up).

69.     In enacting the ATDS prohibition, the Third Circuit cited favorably to Congressional understanding "that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications," including by "relying on computerized databases containing telephone numbers during their dialing campaigns." *Id.* at 880 (cleaned up). The Third Circuit held that, in passing the TCPA's ATDS prohibition, Congress intended to remedy the problems caused by callers using computer software to dial numbers randomly or sequentially from a list or database. *See id.*

70.     The system(s) Defendants used to place the calls to Plaintiff is/are an ATDS because it would be illogical to dial a number manually, have the Plaintiff answer it, and only then connect it to a human being.

71.     Furthermore, audible pauses, clicks, and choppy audio are hallmark indicia of ATDS systems. It supports the inference that Defendants used an ATDS, such as one which "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a preproduced list." *Facebook*, 141 S. Ct. at 1171 n.7.

72.     At least two of the calls were placed from numbers serviced by the company Twilio, a computerized platform designed for making high volumes of automated, sequential or

random calls. Twilio's website boasts the ability to make calls with "indefinite scaling," support up to 250 participants at a time, and mask caller information. *See Voice With the Power of Programmability*, Twilio, https://www.twilio.com/voice [https://archive.ph/ktY0A].

73.     Indeed, Twilio's documentation outlines in detail the computer programming code necessary to make automated calls from a list, including a computerized database of numbers, at a rate of one call per second, in addition to the code needed in order to tell the system what action to take depending on if a party answers. *See Making Calls*, Twilio Docs, https://www.twilio.com/docs/voice/make-calls [https://archive.ph/kVbSz].

74.     The fact that the calls from 267-780-9049 transmitted inaccurate Caller ID Name information that did not match the subscriber of record supports the inference that they were also placed using an ATDS. It follows that if the dialer has the capacity to store or produce random numbers to transmit a caller ID, it also has the capacity to store or produce random telephone numbers to be dialed, especially because the equipment needed to manipulate a caller ID to display a different name from the subscriber is far more sophisticated than the equipment needed to place a call to a random or sequential telephone number.

75.     As this Court has remarked, other courts have held, post-*Facebook*, that allegations similar to those as here of the absence of a relationship between the parties, and the random nature of the automation device (such as the ability to randomly generate caller ID numbers), are all indicia of use of a random or sequential dialing device that gives rise to the inference at the pleadings stage that an ATDS was used to make the calls. *See Camunas v. Nat'l Republican Senatorial Comm.*, No. 21-1005, 2021 U.S. Dist. LEXIS 100125 at *11 (E.D. Pa. May 26, 2021).

76.     No facts exist here to support the conclusion that Defendants were calling from a curated list of their past customers. By contrast to a company that dials calls *en masse* to multiple individuals from a list of telephone numbers (as here), a company that calls its existing customers utilizing an imported customer list does not place calls using an ATDS because such calling uses a database targeting existing customers' information rather than computer-generated tables or lists of individuals to be called. *See Panzarella*, 37 F.4th at 881–882.

77.     Plaintiff is ignorant of the exact process by which the system(s) used by the Defendants operate other than drawing the reasonable inference and making the allegation that it stores or produces telephone numbers randomly or possibly sequentially based on the facts ascertainable from the calls he received, as outlined above. Indeed, as at least one district court explained, "The newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage." *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021); *accord Miles v. Medicredit, Inc.*, No. 4:20-cv-01186-JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021).

Defendants' Liability for "Natalie's" and "Melanie's" Conduct

78.     The Federal Communication Commission ("FCC") is tasked with promulgating rules and orders related to enforcement of the TCPA. *See* 47 U.S.C. 227(b)(2).

79.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

80.     In their January 4, 2008 ruling, the FCC reiterated that an entity on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing

"on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

81.     On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers, such as Defendants Khalil and Ghanim, may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

82.     More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

83.     The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

84.     The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed

information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 CC Rcd at 6592 (¶ 46).

85.     Defendants Khalil and Ghanim knowingly and actively accepted business that originated through the illegal calls placed by the individuals or entities identified as "Natalie" and "Melanie."

86.     Defendants Khalil and Ghanim, through access to and receipt of leads generated by the individuals or entities identified as "Natalie" and "Melanie," had the ability to identify the fact that "Natalie" and "Melanie" were calling individuals on the National Do Not Call Registry.

87.     Moreover, Defendants Khalil and Ghanim maintained interim control over the actions of the part(ies) that made the call.

88.     Defendant Khalil referred to both "Natalie" and "Melanie" as his "assistants." The very fact he did so gives rise to an inference that "Natalie" and "Melanie" are Khalil's agents in a textbook agency relationship.

89.     For example, Khalil and Ghanim had absolute control over whether, and under what circumstances, it would accept a customer or what services it would provide to that customer.

90.     Upon information and belief, Khalil and Ghanim also gave interim instructions to these entities by providing: (a) the locations and perspective individuals they were permitted to

call; (b) the script that the callers would have to use; and (c) instructions to provide screenshots, recordings, call details, and other data surrounding certain calls and prospective customers for review.

91.     Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

Defendants' Conduct Violates the TCPA

92.     The communications received by Plaintiff demonstrate that they were sent for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services as they sought to have him purchase, or alternatively invest in, Defendants' self-described "real estate consulting" services. Importantly, telemarketing calls do not necessarily require a request of an outlay of money on the part of the called party. The calls therefore qualified as telemarketing. 47 C.F.R. § 64.1200(f)(12).

93.     Defendants Khalil and Ghanim made the automated calls. They either physically programmed the automatic dialer to dial them or instructed others to do the same.

94.     The Plaintiff never provided his consent or requested these calls.

95.     Defendants ignored multiple requests not to be called and indications that the Plaintiff was not interested.

96.     Based on this fact, it is evident that Defendants do not maintain Do Not Call policies and procedures as required by law, nor do they maintain an internal Do Not Call list.

97. Plaintiff was harmed by these calls. He was temporarily deprived of legitimate use of his phone because his phone line was tied up during the automated calls and his privacy was improperly invaded. The Plaintiff was charged for the calls. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff.

**Legal Claims**
**Count One:**
**Violation of the TCPA's Prohibition Against Automated Calling**
**With an Automatic Telephone Dialing System (ATDS)**

98. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

99. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to the telephone number(s) of Plaintiff using an ATDS.

100. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff is entitled to an award of $500 in damages for each and every call made to his telephone number for which he is charged for the call using an ATDS in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

101. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

102. The Defendants' violations were wilful and/or knowing.

## Count Two:
## Violation of the Pennsylvania Telemarketer Registration Act
### 73  Pa. Cons. Stat. § 2241

103.     By placing at least four telemarketing calls to the Plaintiff without registering as

telemarketers under Pennsylvania law, Defendants, jointly and severally, violated 73 Pa. Cons.

Stat. § 2243. Moreover, by failing to identify themselves in the messages, Defendants, jointly

and severally, violated 73 Pa. Cons. Stat. § 2245.1.

104.     This constitutes four violations of the Pennsylvania Unfair Trade Practices and

Consumer Protection Law. 73 Pa. Cons. Stat. § 2246(a).

105.     The foregoing acts and omissions of Defendants and/or their affiliates, agents,

and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple

violations of the Pennsylvania Telemarketer Registration Act (PTRA), 73 Pa. Cons. Stat. § 2241,

including by making calls to Plaintiff's number, on the Pennsylvania Do-Not-Call registry,

without registration.

106.     As a result of Defendants' and/or their affiliates, agents, and/or other persons or

entities acting on their behalf's violations of the PTRA, 73 Pa. Cons. Stat. § 2241, Plaintiff is

entitled to an award of $300 in damages for each and every call made to his telephone number in

violation of the statute, pursuant to the Pennsylvania Unfair Trade Practices and Consumer

Protection Law, 73 Pa. Cons. Stat. § 201. *See* 73 Pa. Cons. Stat. § 2246(a).

107.     Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants

and/or their affiliates, agents, and/or other persons or entities acting on their behalf from

violating the PTRA in the future.

**Count Three:**
**Violation of the TCPA's Implementing Regulations**
**Codified at 47 C.F.R. § 64.1200**

108. By placing at least four telemarketing calls to the Plaintiff, whose number is on the Do-Not-Call registry, failing to have a written Do-Not-Call policy, and failing to maintain the Plaintiff on their Do-Not-Call list, Defendant, jointly and severally, violated 47 U.S.C. § 227(c)(5) by violating the implementing regulations codified in 47 C.F.R. § 64.1200(c) and (d).

109. This amounts to twelve violations since Defendants committed three violations per call. The first violation is calling a number on the national Do-Not-Call registry. 47 C.F.R. § 64.1200(c)(2). The second violation is by calling Plaintiff without having a Do-Not-Call policy in place. 47 C.F.R. § 64.1200(d)(1). The third violation is by calling Plaintiff without maintaining the Plaintiff on their internal Do-Not-Call list. 47 C.F.R. § 64.1200(d)(6).

110. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute at least six violations of the TCPA, 47 U.S.C. § 227(c), codified at 47 C.F.R. § 64.1200, by, *inter alia*, refusing to scrub against the National Do-Not-Call registry, refusing to maintain Mr. Perrong's number on an internal Do-Not-Call list, and failing to have a Do-Not-Call policy.

111. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the TCPA, 47 U.S.C. § 227(c), Plaintiff is entitled to an award of $500 in damages for each and every call and violation made to his telephone number in violation of the TCPA's implementing regulations codified at 47 C.F.R. § 64.1200, pursuant to 47 U.S.C. § 227(c)(5)(B).

112. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from

violating the TCPA, 47 U.S.C. § 227(c), by making calls in violation of any of the TCPA's implementing regulations in the future.

113.    The Defendants' violations were knowing and/or willful. Accordingly, the Plaintiff seeks up to treble damages of the $500 per violation award, as provided in 47 U.S.C. § 227(b)(3)(B).

**Relief Sought**

WHEREFORE, Plaintiff requests the following relief:

A.    Injunctive relief prohibiting Defendants from calling telephone numbers using an artificial or prerecorded voice and/or ATDS.

B.    Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3) or 47 U.S.C. § 227(c)(5).

C.    Because of Defendants' violations of the PTRA, Plaintiff Perrong seeks for himself $300 in damages for each violation, pursuant to 73 Pa. Cons. Stat. § 201-9.2(a).

D.    Such other relief as the Court deems just and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Dated: **July 29, 2022**

_____/s/_____
Andrew R. Perrong
*Plaintiff Pro-Se*
1657 The Fairway #131
Jenkintown, PA 19046
Phone: 215-791-6957
Facsimile: 888-329-0305
andyperrong@gmail.com